Viola JOHNSON, Plaintiff-Respondent,

v.

George L. BUSH and Ozark Gas and Appliance Company, a corporation, Defendants-Appellants.

No. 8573.

Springfield Court of Appeals.

Missouri.

Aug. 25, 1967.

Raymond E. Whiteaker, Allen, Woolsey & Fisher, Springfield, for defendants-appellants.

B. H. Clampett, Paul D. Rittershouse, Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, for plaintiff-respondent.

HOGAN, Judge.

This is an action begun by plaintiff to recover damages for personal injuries and property damages sustained in an automobile collision. The plaintiff originally sued defendant George L. Bush (the driver of the vehicle which collided with hers), the driver's father, and a corporation owned by the driver's father, upon the theory that defendant George L. Bush was the agent and servant of one of the other two defendants. Defendant George L. Bush filed a counterclaim which we need not consider here, and the corporate defendant filed a counterclaim for property damage done to its vehicle which George L. Bush was driving. The plaintiff dismissed as to the driver's father and the corporate defendant, and submitted her case against defendant George L. Bush upon both primary and humanitarian negligence. The counterclaim made by defendant Ozark Gas and Appliance Company was also submitted. A jury resolved the matter by finding for the plaintiff in the aggregate sum of $3,000 and against both defendants. The defendants have appealed. The nature and extent of the plaintiff's injuries are not in dispute. Our review will be limited to those claims of error which have been briefed and argued in this court. White v. Kuhnert, Mo.App., 207 S.W.2d 839, 840 [1].

The accident which gave rise to this case occurred in the city of Springfield, Missouri, when the plaintiff, emerging from a private driveway, attempted to turn left on Kearney Street. Kearney is 58 feet wide and runs east and west at this point. It is divided into six lanes, two each for east and westbound traffic, with an outer "de-acceleration" lane next to the curb on both the north and south sides. The plaintiff stated that at the time in question "traffic * * * was pretty heavy [on Kearney] either from one direction or the other."

Mrs. Johnson had stopped at a service station on the north side of the street to have some air put in her right front tire. The service station is on the north side of Kearney facing south, and there are two driveways leading from the service station into the street, one at the east side of the station and the other at the west. The plaintiff had entered the premises from the east and was headed west when she stopped. In order for her to get to her destination, it was necessary for her to leave the service station by the west driveway, cross Kearney from north to south, and proceed easterly in one of the south (eastbound) traffic lanes. Accordingly, Mrs. Johnson moved to the west entrance and turned south "with [her] front wheels next to the dip [at the curbline]" and "sat [there] quite a little while looking both ways." The evidence establishes that at this point Kearney slopes down to the west and that the crest of the slope or hill is 375 feet east of the approximate center of the driveway from which the plaintiff started to turn. Plaintiff stated that when the last car passed going west, she looked to the west and saw one eastbound car on Kearney approximately two blocks away, then looked back to the east "and there was nothing there and I took off into the street," at

a speed of "anywhere from five to ten miles an hour." Mrs. Johnson was "looking to the east as [she] pulled out into the street," but "did look where [she] was going out in the street later." As Mrs. Johnson "got out into the street and was crossing the center line," with her vehicle headed "southeasterly, though mostly east," the defendant's vehicle, going west, struck the "left front" part of plaintiff's vehicle. Plaintiff stated that she did not see the defendant's vehicle until it was "* * * like two, three feet from [her]," and estimated that Mr. Bush was driving very fast, "fifty, sixty."

In support of her case, the plaintiff introduced parts of a pre-trial deposition given by defendant Bush. Mr. Bush's version of the facts was that immediately prior to the collision he "came up over a hill" going west on Kearney, and that "just when [he] came over the top of the hill" in the south westbound lane, he saw plaintiff's vehicle "sitting in the middle of the road, blocking the right-hand lane." Mr. Bush believed that he had plenty of time to "go around" on the left but according to his testimony plaintiff saw him and stepped on the gas and he had to swerve over into the eastbound (south) lane, but he "swerved as far as [he] could and still hit her." Mr. Bush estimated that plaintiff was no more than 80 feet away when he first saw her, and that her vehicle was then sitting with the "front bumper just over the center line between the right and left-hand lanes" in the westbound portion of the highway. Mr. Bush estimated his speed to be about 30 miles per hour at the point of impact. Much other evidence was presented, but this is a sufficient background statement to show the nature of the case.

The appellants' first point is that the trial court erred in submitting the cause on defendant Bush's primary negligence, because the plaintiff was contributorily negligent as a matter of law in 1) failing to yield the right of way to the defendant, and 2) in failing to maintain a vigilant

lookout as she drove from the service station into the street.

■ We agree with the appellants in their assertion that the plaintiff was under a duty to maintain a vigilant lookout as she emerged from the service station, and that her duty to the defendant was also governed by the provisions of Section 304.021, par. 5 RSMo 1959, V.A.M.S., which reads:

"The driver of a vehicle about to enter or cross a highway from an alley or any private road or driveway shall yield the right of way to all vehicles approaching on said road or highway."

Nevertheless, we do not conceive the plaintiff's duty in the same absolute and unyielding terms as the appellants. As plaintiff started to cross Kearney, she did have a duty to maintain a careful and vigilant lookout, and that duty required her to take cognizance of the traffic hazards which a very careful and prudent person should have seen in the same or similar circumstances, James v. Berry, Mo.App., 301 S.W.2d 530, 533 [5]; Heinecke v. Hardware Mut. Cas. Co., 264 Wis. 89, 58 N.W.2d 442, 444 [3], but the plaintiff was not required to see over hills or around obstacles, Fuzzell v. Williams, Mo.App., 288 S.W.2d 372, 376 [10], nor maintain a continuous lookout in one direction, Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918, 923 [5]; Jones v. Fritz, Mo.App., 353 S.W.2d 393, 398 [9], and in point of fact, the question whether a driver has been negligent in failing to keep a lookout in a particular direction and has thereby failed to see all he should have seen is usually a jury question. Slaughter v. Myers, Mo., 335 S.W.2d 50, 54 [6]; Cox v. Moore, Mo.App., 394 S.W.2d 65, 70 [13]; 61 C.J.S. Motor Vehicles § 526, pp. 437–438. Likewise, though the statute governing the right of way in this situation is absolute in its terms, the plaintiff is only required to yield to those vehicles approaching so closely as to constitute an

immediate hazard, Taylor v. Schneider, Mo.App., 370 S.W.2d 725, 728–729 [5]; 60 C.J.S. Motor Vehicles § 347(b), p. 811, and if, in the most favorable view of the evidence, a jury could have found that the plaintiff, acting as a very careful and prudent person would act, started to cross Kearney in the reasonable belief that she had sufficient time and space to proceed to the eastbound lanes in safety, then it cannot be said that she was contributorily negligent as a matter of law in failing to yield the right of way to Mr. Bush. State v. Arena, 46 Haw. 315, 379 P.2d 594, 603 [8–10]; Peterson v. Lang, 239 Minn. 319, 58 N.W.2d 609, 612–613 [4–6]; Temple v. Ellington, 177 Va. 134, 12 S.E.2d 826, 828–829 [5] [6].

■ In arguing the plaintiff's contributory negligence, the appellants have laid great stress upon various conflicting estimates of speed, distance, position and time made by the parties and various other witnesses, inviting us to join them in their conclusion that Mrs. Johnson was contributorily negligent as a matter of law through a process of extrapolation from these estimates. We decline to do so. An examination of the record shows that much of the testimony upon which they base this argument consists of tentative and hesitantly given "estimates" and "best judgments" recalled from the witnesses' memories of events which occurred under great stress a year and a half before the trial. Though calculations based on such estimates sometimes have a special relevance in the arcane world of the humanitarian doctrine, see Herr v. Ruprecht, Mo., 331 S.W.2d 642, 648–649 [7]; Dillon v. Hogue, Mo.App., 381 S.W.2d 599, 602, and authorities cited note 1, it is sufficient to say that as far as plaintiff's primary submission is concerned, the witnesses' estimates of speed, distance, time and position cannot realistically be classified as absolute facts which the jury was bound to accept as true,[1] and that calculations based on such estimates and approximations cannot convict a plaintiff of contributory negligence as a matter of law.[2]

■ A plaintiff's contributory negligence is a jury question unless it must be said from all the evidence and the reasonable inferences therefrom, viewed in a light most favorable to the plaintiff, that the only reasonable conclusion is that plaintiff was negligent and his negligence was a proximate cause of the injury. Hardy v. St. Louis-San Francisco Ry. Co., Mo., 406 S.W.2d 653, 658 [4]; Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14, 19 [1]. We think the most that can be said here on the issue of contributory negligence is that reasonable minds might differ. It may be granted that a jury could reasonably have found Mrs. Johnson contributorily negligent, but we believe a jury might also have found the facts to be as follows: That the plaintiff stopped at the north curbline of Kearney and looked both to the east and to the west. She saw one eastbound vehicle approaching from the west about two blocks away and none approaching from the east. We do not attach the same importance as do appellants to Mrs. Johnson's statement that there was positively no vehicle in the westbound lanes as she started across the street; her observation seems to us to be corroborated by Mr. Bush's testimony that plaintiff was already in the act of turning "just when I came over the top of the hill." Testimony was given by one witness indicating that an automobile proceeding west on Kearney is partially visible from plaintiff's point of

---

1. Young v. Missouri-Kansas-Texas R. Co., Mo., 100 S.W.2d 929, 934 [3–5]; Jones v. Fritz, supra, 353 S.W.2d at 399 [11, 12]; Caffey v. St. Louis-San Francisco Ry. Co., Mo.App., 292 S.W.2d 611, 617–618; 88 C.J.S. Trial § 208(2) (g) (5), p. 442.

2. Zumault v. Wabash R.R. Co., Mo., 302 S.W.2d 861, 864–865 [6]; Smith v. Siercks, Mo., 277 S.W.2d 521, 525 [3]; State ex rel. Thompson v. Shain, 351 Mo. 530, 534–538, 173 S.W.2d 406, 407–409 [2]; DeRossett v. Malone, 34 Tenn.App. 451, 239 S.W.2d 366, 378 [33–36].

exit into the street at a distance somewhat greater than 375 feet, but the evidence indicates to us that the hill crest 375 feet to the east was the practical limit of plaintiff's vision to her left as she emerged from the driveway, for if Mr. Bush did not see Mrs. Johnson until he came over the crest of the hill, it would seem reasonable to suppose that she could not see him until he had done so. We think a jury could have found that plaintiff reasonably believed from appearances that she could cross Kearney in safety, and that as Mr. Bush came over the crest of the hill Mrs. Johnson had already begun her turn and was proceeding across Kearney. In terms of comparable situations, we do not consider that the plaintiff was in a position analogous to that of the plaintiffs in Ely v. Parsons, Mo.App., 399 S.W. 2d 613, James v. Berry, supra, 301 S.W.2d 530, and the other cases cited by the appellants. Rather, the plaintiff's situation seems to us to have been much more nearly comparable to that of the plaintiffs in Cooksey v. Ace Cab Co., Mo., 289 S.W. 2d 40, 44 [1–4], Highfill v. Maier, Mo. App., 379 S.W.2d 191, 193–194 [3] [4, 5], and Reynolds v. Consolidated Cabs, Inc., Mo.App., 374 S.W.2d 955, 959 [4] [5–7], even though the parties' rights and duties were not strictly the same as those of drivers at uncontrolled intersections. 7 Am. Jur.2d Automobiles and Highway Traffic, § 204, p. 756. In other words, and although they could reasonably have found otherwise, a jury could have believed that Mrs. Johnson had already begun a lawful maneuver and had pre-empted the right of way by the time she and Mr. Bush first became visible to each other and while defendant Bush was still 375 feet, or nearly that far, from the point of collision.

It thus follows that the trial court did not err, for either reason assigned by the appellants, in submitting the plaintiff's case on primary negligence, and since defendant Ozark Gas and Appliance Company concedes that the judgment on its counterclaim must stand if plaintiff made a submissible primary case, we need not consider its claim of error further. This does not, however, dispose of the appeal. The law now requires that there be substantial evidence to support every theory of recovery submitted to the jury, and therefore, even if the evidence is sufficient to justify plaintiff's primary submission, there is reversible error unless it also supports her humanitarian submission, M.A.I. 1.02, p. 7; Hardy v. St. Louis-San Francisco Ry. Co., supra, 406 S.W.2d at 659 [6], though formerly there was no error if the plaintiff's evidence supported either theory of submission. Nelson v. Wabash R.R. Co., Mo., 300 S.W.2d 407, 409 [1]. Further, the humanitarian negligence submitted was not a single compound act of negligence, as discussed in Nelson v. O'Leary, Mo., 291 S.W.2d 142, 148 [7], Frandeka v. St. Louis Pub. Serv. Co., 361 Mo. 245, 258–259, 234 S.W.2d 540, 549 [17], and as authorized to be submitted by M.A.I. 17.14; plaintiff's humanitarian instruction was an alternative submission predicating recovery upon defendant Bush's failure to stop or slacken his speed, as authorized in humanitarian cases by M.A.I. 17.15. Since the instruction allows recovery upon a finding of either of two alternatives, there must be evidentiary support in the record for each disjunctive hypothesis.[3] Primarily, the appellants' point with regard to the humanitarian submission is that the plaintiff failed to prove that defendant Bush had the ability to avert the accident with the means at hand and with reasonable safety to himself and to others after he knew or should have known that plaintiff was in a position of immediate danger, or imminent peril, as it used to be called. We agree that such proof was an essential element of plain-

---

3. M.A.I. 1.02, pp. 6–7; Whitehead v. Fogelman, Mo.App., 44 S.W.2d 261, 263; Barth v. San Juan Development Co., 168 Cal.App.2d 760, 336 P.2d 203, 206–207 [7]; 88 C.J.S. Trial § 327(c), pp. 855–856.

tiff's humanitarian case. Lane v. Wilson, Mo.App., 390 S.W.2d 943, 949 [8].

██ Again in this connection, as in their argument that no primary case was made, the appellants have reconstructed the accident from the estimates of speed, time, distance and position made by the various witnesses. As indicated, we agree that calculations based on such testimony have a special importance in humanitarian cases, but in this instance the evidence which supports the primary submission also supports the humanitarian submission, and we find it unnecessary to analyze the casualty foot by foot and second by second. Without examining all the computations made by the appellants in detail, we may say that we are not inclined to hold a plaintiff strictly bound by exact figures as to speed, time or distance when such figures consist of estimates, even in humanitarian cases, and in particular we do not think the submissibility of the plaintiff's case should turn upon the estimate made by one witness that the development time of the whole casualty was "just two or three or four seconds," when there is other more favorable evidence indicating that the defendant had an ample opportunity to avert the collision after his humanitarian duty arose. Much more substantial is appellants' argument that plaintiff may not claim the benefit of defendant Bush's pre-trial deposition, introduced as an admission, because this evidence is "at war" with her own testimony.

██ This last argument is not without merit, and if the plaintiff's testimony were fairly comparable to the plaintiff's testimony in Thomas v. Aines Farm Dairy, Mo.App., 257 S.W.2d 228, 232 [2], and the other cases which the appellants have cited and compared to this one, we would be inclined to agree. Plaintiff's testimony, or some of it, is indeed subject to the con-

struction that she was looking to the east when she emerged from the driveway, and that she continued to look in that particular direction as she turned. Of course, if she was aware that the Bush vehicle was approaching, then defendant Bush's humanitarian duty would not have commenced until plaintiff was actually in his path of travel or so close to it that it was apparent (at the rate of speed and manner she was traveling) that she would not stop before reaching it. Frandeka v. St. Louis Pub. Serv. Co., supra, 361 Mo. at 256, 234 S.W.2d at 547 [14]; Smithers v. Barker, 341 Mo. 1017, 1027–1028, 111 S. W.2d 47, 53 [7]. On the other hand, if plaintiff was not aware of defendant Bush's approach, then defendant's duty to act arose when it was or should have been reasonably apparent that plaintiff was oblivious to his approach and was intent on moving into his path, and plaintiff could have been found by the jury to be in immediate danger or imminent peril while she was still approaching defendant Bush's line of travel. Silver v. Westlake, Mo., 248 S.W.2d 628, 632 [1, 2]. A plaintiff may, by his own testimony, cut down the time of imminent peril to the point that he literally testifies himself out of court, Yeaman v. Storms, 358 Mo. 774, 779–781, 217 S.W. 2d 495, 499–500 [3–5] [6]; Thomas v. Aines Farm Dairy, supra, 257 S.W.2d at 232 [2], but in order to determine if Mrs. Johnson's testimony amounts to a binding admission that she was a non-oblivious plaintiff, we must at least consider her testimony as a whole, 32A C.J.S. Evidence § 1040(3), p. 784, and it should appear that the testimony relied on as an admission was clear and unqualified and was not the result of mistake, oversight, misunderstanding, or lack of definite recollection.[4] In this case, Mrs. Johnson seems to have misunderstood what counsel meant when she was asked where she was looking as she

---

4. Martin v. Kansas City, Mo., 340 S.W.2d 645, 647–649 [1] [2] [3]; Smith v. Siercks, supra, 277 S.W.2d at 525–526 [4]; Steele v. Kansas City Southern Ry. Co., 265 Mo. 97, 110–111, 175 S.W. 177, 179–180 [2]; Goggin v. Schoening, Mo. App., 199 S.W.2d 87, 93 [4].

turned left into Kearney from the driveway. At one point in her direct examination Mrs. Johnson did testify that she looked to the east and "continued looking to the east as I pulled out on to the highway," but she qualified or explained this a few questions later by saying that "I did look where I was going out in the street later." During her cross examination she testified similarly by answering "yes" when she was asked if she "continued looking east as you pulled across the highway," but plaintiff further explained this answer by stating "and then I looked straight ahead so I would know where to be turning to get into my lane, and it was then, after I turned and first glanced up, that he was right into me." Quotations of this sort might be multiplied, but when we consider the plaintiff's testimony as a whole, the sense of it was that she divided her attention between the different directions in which she had to look, and in our opinion her testimony does not amount to a binding admission that she fixed her attention upon approaching westbound traffic during all the time she was crossing, so as to preclude her recovery as an oblivious plaintiff.

 Again, as with the primary submission, we think a jury could reasonably have found that when Mr. Bush "came over the hill" 375 feet east of the center of the driveway from which plaintiff emerged, or, as he also stated, when he was not "more than five feet over the crest," Mrs. Johnson had already started her turn and was looking to the west, away from Mr. Bush. In these circumstances, the position of plaintiff's vehicle and her direction of travel could have been found to indicate her intention to travel across the defendant's path, and a jury could reasonably have found Mrs. Johnson to be in immediate danger from the moment her vehicle and her inattention became or should have become apparent to Mr. Bush. Defendant Bush then had at least 370 feet in which to act. Two witnesses estimated Mr. Bush's speed at 50 miles per hour.

Even though we do not judicially know the precise distance in which Mr. Bush could have stopped, we know judicially that he could have stopped within 350 feet. Perry v. Dever, Mo., 303 S.W.2d 1, 7 [14]. It reasonably follows that he could have slackened his speed sufficiently to allow plaintiff to pass in safety, Fultz v. Southwestern Bell Telephone Co., Mo.App., 382 S.W.2d 24, 28 [3], and plaintiff made a submissible humanitarian case upon both disjunctive hypotheses.

We conclude that no reversible error is demonstrated upon the record presented for any of the reasons briefed and argued in this court, and the judgment is therefore affirmed.

STONE, P. J., and TITUS, J., concur.