LAMBERT BROTHERS, INC., Plaintiff-Respondent,

v.

TRI CITY CONSTRUCTION COMPANY, a corporation, Defendant-Appellant.

LAMBERT BROTHERS, INC., Plaintiff-Appellant,

v.

TRI CITY CONSTRUCTION COMPANY, a corporation, Defendant-Respondent.

Nos. 9576, 9577.

Missouri Court of Appeals, Springfield District.

Oct. 8, 1974.

L. R. Buehner, Charles E. Buchanan, Buehner & Buehner, Joplin, for defendant-appellant.

Woolsey, Fisher, Clark, Whiteaker & Stenger, Russell G. Clark, Springfield, for plaintiff-respondent.

FLANIGAN, Judge.

Neither plaintiff Lambert Brothers, Inc. (Lambert) nor defendant Tri City Construction Co. (Tri City) is happy with the result in the trial court and both have appealed. On October 10, 1972, the trial court entered a default judgment in favor of Lambert in the amount of $30,520. On October 16, 1972, the trial court set this judgment aside. A jury trial, which ended on March 16, 1973, resulted in a verdict and judgment in favor of Lambert in the amount of $18,000.

Lambert seeks reinstatement of the $30,520 judgment. Tri City, content with the setting aside of the $30,520 judgment, seeks reversal of the $18,000 judgment. Neither succeeds.

The appeals will be discussed separately.

## APPEAL OF PLAINTIFF LAMBERT

Lambert seeks reinstatement of the default judgment[1] in the amount of $30,520. The following chronology is germane to that effort:

May 6, 1972 Lambert filed this action against Tri City seeking $30,520 in damages ($22,500 for alleged damage to a tractor, $5,000 for alleged damage to a trailer, $1,270 for expenses incurred in obtaining a wrecker and cleaning up the highway and $1,750 for loss of use of the tractor-trailer unit).

June 19, 1972 Tri City filed its motion to dismiss.[2]

---

1. This judgment was certainly a "default judgment" as that term is loosely employed; whether it was technically such is of no moment here, but the curious may consult 49 C.J.S. Judgments § 187, p. 324 (1947). See also Rule 74.045, V.A.M.R., which provides for interlocutory judgments on default, and Rule 74.05, V.A.M.R., which provides for the setting aside of same "for good cause shown" at any time before the damages are assessed or final judgment rendered.

2. Although this motion was filed a few days out of time, prior to the deadline counsel for the plaintiff, to use the language of the defendant's counsel, "very graciously" agreed to its late filing.

August 21, 1972 The trial court overruled the motion to dismiss and gave Tri City 20 days in which to plead.

August 22, 1972 Russell G. Clark, one of Lambert's attorneys, wrote a letter to Lloyd Buehner, one of Tri City's attorneys, informing him of what had transpired on August 21.

September 22, 1972 Attorney Clark, by letter to Attorney Buehner, reminded him of the contents of his letter of August 22, 1972. The letter of Mr. Clark then stated: "I did not want to take a default judgment without first having given you notice that you were in default."

October 10, 1972 A hearing was held before the trial judge, Hon. William H. Pinnell. Lambert appeared by its attorney, Russell Clark, but there was no appearance by Tri City or its attorney. The court entered a judgment in favor of Lambert in the sum of $30,520, and a copy of the judgment was mailed to Mr. Buehner.

October 13, 1972 Tri City filed its "Motion to Set Aside Default Judgment," to which an affidavit was appended.[3]

October 16, 1972 Judge Pinnell entered an order sustaining the motion to set aside the default judgment and granting Tri City leave to answer.

October 19, 1972 Lambert filed its reply to the answer.[4]

March 16, 1973 A jury trial culminated in a verdict and judgment in favor of Lambert in the sum of $18,000.

At the hearing of October 10, 1972, when the default judgment in the amount of $30,520 was entered in Lambert's favor, Lambert offered no evidence with regard to the amount of damages it sustained. The figure of $30,520 was suggested to the court by Attorney Clark but there was no testimony to support that suggestion.[5]

Rule 75.01, V.A.M.R., provides in part: "The trial court retains control over judgments during the 30 day period after entry of judgment and may vacate, reopen, correct, amend or modify its judgment *for good cause* within that time. . . ."

It is the position of Lambert that there was no "good cause" for the setting aside of the default judgment and thus the order of October 16, 1972, which did so, was erroneous. This contention has no merit.

The affidavit of Attorney Buehner, which was appended to the Tri City motion to set aside the default judgment, con-

---

3. Also on October 13, 1972, Mr. Buehner gave written notice to Mr. Clark that this motion would be "taken up for determination" on October 16, 1972. Also on October 13, 1972, Tri City filed its answer: the certificate of Attorney Buehner stated that a copy of it was mailed to Lambert's attorneys on October 11, 1972. Mr. Buehner's motion stated that he mailed the answer before he had notice of the entry of the default judgment. He later testified to that effect.

4. In this pleading Lambert stated that it did not intend to waive its right to object to the action of the trial court in setting aside the default judgment and specifically reserved the right to assert said objection. At this stage of the action Lambert, although unhappy with the order of October 16, 1972, could not appeal therefrom because "an order vacating a default judgment within 30 days after rendition does not amount to a final judgment." O'Mara v. Gingrich, 424 S.W.

2d 92, 93[1] (Mo.App.1968). However, by appropriate procedural steps taken following the entry of the judgment on March 16, 1973, upon this appeal, Lambert "is entitled to a determination of his complaint, timely made and carefully preserved at each stage of the case, that the trial court erred in setting aside the default judgment." Kollmeyer v. Willis, 408 S.W.2d 370, 376[2] (Mo.App.1966). See also Dennis v. Jenkins, 422 S.W.2d 393 (Mo. App.1967).

5. On the question of the necessity for such proof, see Sumpter v. J. E. Sieben Construction Co., 492 S.W.2d 150, 154-155 (Mo.App. 1973); Thomas v. Commercial Credit Corporation, 335 S.W.2d 703, 706[4] (Mo.App. 1960); Putney v. Du Bois Co., 240 Mo.App. 1075, 1085, 226 S.W.2d 737, 740[1] (1950). In his opening statement to the jury, at the subsequent trial, Mr. Clark told the jury that Lambert's damage "adds up to $23,570.00."

tained certain recitals of fact pertaining to the manner in which the collision had occurred. Lambert, with commendable candor, has conceded that the facts contained in that affidavit amount to a meritorious defense to the cause of action stated in the petition.

Tri City's motion, filed on October 13, 1972, stated in part that "during the leave period within which to file answer and for some time thereafter" Mr. Buehner was "busily engaged in appellate matters" involving Lambert's law firm; that at the same time, Mr. Buehner was involved in the dissolution of a partnership which was time-consuming.[6]

The motion also stated: "That the course of dealing between the plaintiff's firm and the defendant's firm, and certain correspondence concerning that relationship was of such a nature that defendant's counsel did not seriously believe that plaintiff's counsel would take a default judgment in the matter without specific notice of the time and place when such default judgment might be taken."

Mr. Buehner's affidavit, which was appended to the motion, supported its factual allegations. The affidavit also referred to Attorney Clark's letter of September 22, 1972, and stated: "Said letter contained the equivocal announcement, 'I did not want to take a default judgment without first having given you notice that you were in default.' That such statement was not taken by affiant to mean that counsel for the plaintiff had a present intention to take such default judgment without further notice as regards the specific time when he would do so. By virtue of the premises set forth herein this affiant states that he was possibly lulled into not paying strict attention to the pleadings and the time schedule pertaining thereto and relied, without justification, on the past lenient dealings be-

tween the party [sic] in this case and other cases."

Attached to the affidavit were copies of Mr. Clark's letters of August 22, 1972, and September 22, 1972. Also attached was a copy of a letter from Mr. Buehner to Mr. Clark dated June 8, 1972, in which Mr. Buehner expressed to Mr. Clark his appreciation for his "courtesies in this matter," the letter referring to the granting of extra time in which to file the motion to dismiss. In another attached letter dated June 17, 1972, from Mr. Buehner to Mr. Clark, Mr. Buehner enclosed a copy of the motion to dismiss, again thanked Mr. Clark for his courtesies, and stated "I now have a file on hand and will discuss this matter at length with you at a later date."

■ Judgments by default are not favored. 49 C.J.S. Judgments § 187, p. 326, n. 24 (1947). "The entry of a default judgment against a party litigant is a harsh and drastic action." 47 Am.Jur.2d Judgments § 1154, p. 185 (1969). A default judgment which has been set aside by a trial court within the 30-day period prescribed by Rule 75.01, V.A.M.R., has little chance of rebirth in an appellate court.

In Kollmeyer v. Willis, 408 S.W.2d 370 (Mo.App.1966), this court reviewed the propriety of an order of the trial court setting aside a default judgment, the order having been entered less than 30 days after entry of the judgment. The following general principles were stated: The setting aside of a default judgment is a matter resting largely in the discretion of the trial judge. It is not a mental discretion to be exercised ex gratia, but a legal discretion to be exercised in conformity with the spirit of the law and in a manner to subserve, and not impede or defeat the ends of substantial justice. Kollmeyer, supra, 408 S.W.2d at 380[12]. The principle that each case must be ruled upon its own par-

---

6. For cases dealing with the press of other business as a factor to warrant the setting aside of default judgments, see, for varying results, Clinton v. Clinton, 444 S.W.2d 677,

680[2] (Mo.App.1969); Savings Finance Corp. v. Blair, 280 S.W.2d 675 (Mo.App. 1955); Goodwin v. Kochititzky, 3 S.W.2d 1051 (Mo.App.1928).

ticular facts is especially applicable to an inquiry as to whether a trial court has been guilty of an abuse of discretion in setting aside or in refusing to set aside a default judgment. Kollmeyer, supra, 408 S.W.2d at 380[13]. An appellate court is less likely to interfere when the trial court has set aside a default judgment than when it has not. This is for the reason that when the judgment is set aside, the case is reopened and justice will yet be done on the merits and is in keeping with and in furtherance of the policy of the law to try and determine cases on their merits when that will not result in harmful delay. Kollmeyer, supra, 408 S.W.2d at 380[14]. The trial court has, during the period of 30 days after entry of judgment, the same inherent power to vacate a judgment "for good cause" as, under prior practice, it did during the judgment term. Kollmeyer, supra, 408 S.W.2d at 381[15].

With regard to the "good cause" language of Rule 75.01, V.A.M.R., in Kollmeyer, this court said at page 381: "[I]nsofar as we have been able to determine, no Missouri court has undertaken to define 'good cause' in a case involving the vacation of a default judgment; and it would seem both unnecessary and unwise for us to do more than suggest that, in this as in other categories of cases, ' "[g]ood cause" depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which the decision is committed' [Wilson v. Morris, Mo., 369 S.W.2d 402, 407(7)—see also Buttinger v. Ely & Walker Dry Goods Co., Mo.App., 42 S.W.2d 982, 984] subject to the limitation that a judgment may not be set aside arbitrarily or capriciously [Willis v. Willis, Mo.App., 274 S.W.2d 621, 625(5)] or without giving the party to be affected adversely reasonable notice and an opportunity to be heard. Savings Trust Co. of St. Louis v. Skain, 345 Mo. 46, 131 S.W.2d 566, 574(14)."

In Vaughn v. Ripley, 416 S.W.2d 226 (Mo.App.1967), referring to the "good cause" language of Rule 75.01, V.A.M.R., the court said at page 228: "Error implies fault. 'Good cause' for remedying it begins with that premise and concerns itself only with whether the fault should be excused or extenuated in the interests of justice. The term 'good cause', as used in this connection, is not susceptible of precise definition, but it was obviously coined to serve a remedial purpose in a matter addressed primarily to the conscience of the court and it should therefore be interpreted with commensurate liberality, not only to prevent a manifest injustice but to avoid a threatened one, especially in cases tried without a jury where evidence on one side only is presented."

The facts in the Vaughn case were somewhat analogous to those here. In Vaughn, opposing counsel had been long acquainted with each other on a first name basis, and "over the years they had come to deal with each other in a friendly and informal manner, with every indication of mutual esteem." Vaughn, supra, 416 S.W.2d at 228. There a good faith misunderstanding between counsel resulted in the defendant and his attorney failing to appear on the date the case was set for trial and a judgment was taken. As in the case at bar, the trial court properly set aside the judgment within the 30-day period prescribed by Rule 75.01, V.A.M.R.

■ Although Judge Pinnell's order of October 16, 1972, referred to Tri City's motion to set aside the default judgment and sustained it, that order may be treated as action taken by the court on its own initiative but at Tri City's suggestion. Kollmeyer v. Willis, supra, 408 S.W.2d at 378; Diekmann v. Associates Discount Corporation, 410 S.W.2d 695, 697 (Mo.App.1966).

■ In reaching his decision to set aside, Judge Pinnell may have considered some or all of the following factors: Although the collision in question had occurred on April 20, 1970, suit was not filed until May 6, 1972; the default judgment was entered less than two months after Tri

City's motion to dismiss had been overruled and approximately one month after Tri City's answer was due to be filed; Tri City's attorney had mailed its answer to the clerk and to opposing counsel one day after the default judgment had been entered and while Mr. Buehner was unaware of its entry; at the hearing which culminated in the default judgment, no evidence was offered on behalf of plaintiff in proof of its damages; Mr. Buehner was in good faith in misunderstanding Mr. Clark's letter of September 22, 1972, and that letter, if it constituted a statement of Mr. Clark's intention to take a default judgment, could have been more clear; neither Tri City nor Mr. Buehner was given any notice, formal or otherwise, of the hearing which was held on October 10, 1972; Mr. Buehner's dealings with Lambert's attorneys, in other matters, had been conducted with a spirit of cooperation, informality and lack of strict adherence to technical deadlines.

Without expressing an opinion on the sufficiency of the foregoing factors, singly or in conjunction with some of the others, to support the setting aside of the default judgment, it is apparent that those factors in the aggregate justify that ruling and satisfy the "good cause" requirement of Rule 75.01, V.A.M.R.

There is no basis for finding that Judge Pinnell acted arbitrarily or capriciously or abused his discretion in setting aside the default judgment. Donnell v. Vigus Quarries, Inc., 457 S.W.2d 249 (Mo.App.1970); Kollmeyer v. Willis, supra, 408 S.W.2d at 370; Vaughn v. Ripley, 416 S.W.2d 226 (Mo.App.1967).

The order of October 16, 1972, setting aside the default judgment of October 10, 1972, in the sum of $30,520 is approved.

## APPEAL OF DEFENDANT
## TRI CITY

■ Tri City makes two appellate contentions; first, that its motion for directed verdict should have been sustained, both at the close of plaintiff's evidence and at the close of all of the evidence, on the ground that Lambert was guilty of contributory negligence as a matter of law; second, that there was no evidence to support the giving of Lambert's verdict directing instruction, Instruction No. II.

These contentions, both lacking in merit, require a review of the evidence in accordance with well established principles. The contentions will be treated in the order in which they have been presented.

"Contributory negligence of a plaintiff ' . . . is usually a jury question, and always is unless it may be said from all the evidence and the reasonable inferences therefrom, viewed in the light most favorable to plaintiff, that the only reasonable conclusion is that plaintiff was proximately negligent.' . . . [I]n order to hold plaintiff contributorily negligent the conclusion must be reached ' . . . that reasonable minds could not differ as to plaintiff's negligence; otherwise the question of plaintiff's contributory negligence [is] for the jury.' " Ruediger v. American Bus Lines, Inc., 426 S.W.2d 4, 10 (Mo. banc 1967). See also German v. Kansas City, 512 S.W.2d 135, 146 (Mo. banc 1974).

"Even if reasonable minds might conclude both plaintiff and defendant were at fault in producing the collision, as the record here suggests, yet we are not at liberty to hold plaintiff guilty of contributory negligence as a matter of law unless the evidence and inferences favorable to plaintiff's submission permit no other reasonable conclusion. Otherwise, plaintiff's contributory negligence is a jury question." Haymes v. Swan, 413 S.W.2d 319, 324 [1, 2] (Mo.App.1967).

On April 20, 1970, a clear and sunny day, at approximately 8:55 a. m., plaintiff Lambert's tractor-trailer unit, driven by its employee, Clark Axline, collided with a "farm tractor rigged up to work on road construction" owned by defendant Tri City and operated by its employee, William Marshall. Mr. Marshall was fatally in-

jured and apparently his death occurred on the day of the accident. Agency of the two drivers for their respective employers was conceded.

The collision occurred on U. S. Highway I-44 near Mt. Vernon, Missouri. I-44 is a divided highway which, at the place of the collision, runs approximately east and west. The southern portion of the highway is for eastbound traffic and consists of two contiguous lanes, each 12 feet wide. The southernmost of the two eastbound lanes will be referred to as Lane 1, and the northernmost eastbound lane as Lane 2.

Trooper James D. Smith of the Missouri Highway Patrol, who testified on behalf of Lambert, investigated the accident. He arrived at the scene approximately 30 minutes after it had happened and while the Lambert tractor-trailer unit and Tri City's tractor were still at the scene. Without objection, the trooper testified that the point of impact was 4½ feet north of the south edge of Lane 1, based primarily upon gouge marks located in Lane 1. In the area where the collision occurred the maximum speed limit for trucks was 60 miles per hour and the minimum speed limit was 40. The trooper had participated in a test with Tri City's Attorney Buehner prior to the accident, which showed that the point of impact and the south shoulder were visible to an eastbound motorist in Lane 1 when the motorist was "something over" 1,500 feet west of the point of impact. The right front portion of the Lambert tractor and the left rear wheel of the Tri City tractor were damaged.

Clark Axline, Lambert's witness (and labeled by Tri City "the only liability witness"), testified that he was driving a 1969 International tractor of the "cab over" type, pulling a trailer. The gross weight of the tractor-trailer unit was 72,000 pounds. The south shoulder of Highway I-44 was about ten feet wide and was as-

phalt. The Lambert unit was proceeding eastwardly in Lane 1, at a speed of approximately 60 miles per hour. Axline saw the Tri City tractor when the vehicles were approximately one-half mile apart.[7] The Tri City tractor was proceeding eastwardly on the south shoulder from the time Axline first saw the Tri City tractor until shortly before the collision. "The Tri City tractor was traveling in a straight line on the shoulder, not doing anything to indicate it was going to turn." As he approached the Tri City tractor, Axline intended to enter or partially enter Lane 2, explaining his intention with the comment, "It's only common courtesy to give a wide berth to a vehicle on the shoulder of the road."

Axline testified that he took his eyes off the Tri City tractor one time to look in his rearview mirror to make sure that Lane 2 was clear of traffic. Just before he glanced in his rearview mirror the Lambert unit was in the middle of Lane 1 and the Tri City tractor was on the shoulder headed east in a straight line. Tri City's criticism of Axline's conduct focuses upon this backward glance. Tri City's first contention, charging Lambert with contributory negligence as a matter of law, states further: "Specifically (Lambert) was contributorily negligent as a matter of law when the undisputed evidence shows that (Axline), while driving in a clearly posted construction area, after seeing a piece of construction equipment on the shoulder immediately in front of him, took his eyes off the road to the front and off the construction equipment for a period of at least 4 seconds."

Axline did not give an estimate of the time consumed in making the glance. He said he did not know how long it took. Three times during his testimony he demonstrated to the jury the manner in which he made, and the time it took to make, that ocular movement.

7. This estimate was apparently in error in view of the visibility test conducted by the trooper and Attorney Buehner. This lends some substance to the contention of Lambert that Axline "overestimated the distances to which he testified."

After this glance, described by Tri City's attorneys as performed "just momentarily" and "in the short time" (a description adopted by Axline in his affirmative responses on cross-examination), Axline again looked forward and saw the Tri City tractor. Asked on cross-examination what distance then separated the vehicles, Axline responded that he did not know, "It seems he was right in front of me." At that time the Tri City tractor was at a 35 degree angle with reference to the south edge of Lane 1. Most of the Tri City tractor was in Lane 1 but its right wheel was still on the shoulder. Axline applied his brakes and swerved to the extreme left "but you can't cut it too short when you are driving that type unit." The front end of the Lambert unit hit the left rear end of the Tri City tractor.

No signal was given by Marshall to indicate he was going to change the course of the Tri City tractor. There were no other vehicles in the vicinity.

Tri City seizes upon a portion of the testimony of Axline, on cross-examination, wherein he stated that to the best of his knowledge the vehicles were 1/10 of a mile apart when he looked in his rearview mirror. However, when that estimate was first mentioned by the witness, he qualified it by the word "probably." Still later, when counsel emphasized that estimate, Axline stated that the distance could have been less.

Although Tri City claims that Axline took his eyes off the road "for a period of at least 4 seconds," there was no direct testimony to that effect. That conclusion is a product of counsel's imagination, based upon the speed testimony and the estimate of the 1/10 of a mile, coupled with counsel's estimate of the time required by Axline to perform his unsuccessful attempt to avoid the collision. There was no positive or definitive testimony with regard to the distance required to stop or swerve the Lambert unit.

"A plaintiff is not conclusively bound by [either] his own or his witnesses' estimates of time, speed or distance." McDonough v. St. Louis Public Service Co., 350 S.W.2d 739, 744[3] (Mo.1961). "[E]ven where there is no other evidence or where the plaintiff so testifies himself, he is not conclusively bound by mere estimates of distance or speed." Carlson v. St. Louis Public Service Co., 358 S.W.2d 795, 800[7] (Mo.1962).

In Johnson v. Bush, 418 S.W.2d 601 (Mo.App.1967), the defendants argued that the plaintiff was guilty of contributory negligence as a matter of law and, in so doing, defendants stressed various conflicting estimates of speed, distance, position and time. In rejecting that argument this court said: "An examination of the record shows that much of the testimony upon which they base this argument consists of tentative and hesitantly given 'estimates' and 'best judgments' recalled from the witnesses' memories of events which occurred under great stress a year and a half before the trial. Though calculations based on such estimates sometimes have a special relevance in the arcane world of the humanitarian doctrine (citations omitted), it is sufficient to say that as far as plaintiff's primary submission is concerned, the witnesses' estimates of speed, distance, time and position cannot realistically be classified as absolute facts which the jury was bound to accept as true, and that calculations based on such estimates and approximations cannot convict a plaintiff of contributory negligence as a matter of law." Johnson v. Bush, supra, 418 S.W.2d at 605[5].

So long as the Lambert unit and the Tri City tractor maintained parallel courses, the distance between them was closing at a rate of 45 miles per hour, or 66 feet per second. Absent a course or speed change by either of the vehicles, an intervening distance of 1/10 of a mile would have been traversed in 8 seconds, but the jury could properly, and apparently did, find that less

than 8 seconds transpired. Axline testified that the intervening distance could have been less than 1/10 of a mile. Moreover, there was a change in the course of the Tri City tractor; it achieved a 35 degree angle in relation to Lane 1. That maneuver would serve to increase the speed of closing and reduce the time for closing the intervening distance.

After completing his rearward glance, Axline saw the Tri City tractor "right in front of me." The jury could properly find that at that moment the right side of the Lambert unit, which was 8 feet wide, was 2 feet north of the south edge of Lane 1. The point of impact was 4½ feet north of the south edge of Lane 1. Thus Axline still had enough time, after making his glance, to react to the new position of the Tri City tractor and to swerve the Lambert unit some 2½ feet before impact. It was his testimony that he did swerve and did apply his brakes prior to impact.

The period of time which Axline utilized in making the backward glance was not totally misspent. A careful movement of a tractor-trailer unit, partially or completely, from Lane 1 to Lane 2 required some observation of conditions behind him.[8]

The record does not reflect, nor could it, whether the turning movement of the Tri City tractor commenced at the very instant that Axline initiated his rearward glance, or whether that movement took place at or near the end of the duration of the glance. So long as the vehicles maintained their parallel courses, no danger of collision existed [Ornder v. Childers, 327 S.W.2d 913, 917[4] (Mo.1959)] and if a portion of the duration of the glance anteceded the commencement of Tri City's turn, such portion could have no causal significance, there being no evidence that Marshall's turn was preceded by a signal.

In 2 Blashfield Automobile Law and Practice (3d Ed.) § 112.7, p. 627, it is said: "Ordinarily the negligence or contributory negligence of the driver of a vehicle which is involved in a collision when attempting to pass another vehicle which makes a turning movement at the time of passing and whether such negligence was the proximate cause of the subsequent accident are questions of fact for the jury."

In § 113.14 of the same text, at p. 719, it is said: "Ordinarily, whether the driver of a following vehicle was negligent or contributorily negligent in failing to observe a preceding vehicle or to maintain a proper lookout for it, and whether such negligence was the proximate cause of a subsequent collision, are questions of fact for the determination of the jury."

Tri City charges that Axline made his rearward glance "while driving in a clearly posted construction area after seeing a piece of construction equipment on the shoulder immediately in front of him."

The quoted description of the prevalent conditions is not supported by the record. It was the testimony of the highway patrolman that there were no flags or signal lights on the Tri City tractor. Photographs of it, introduced by Tri City, show nothing that would mark it distinctively as a "piece of construction equipment." Both the patrolman and Axline testified that there was no construction work going on at the scene of the accident and Axline did not recall seeing any construction signs, nor did he see any men working along the highway.

It is true that Tri City introduced photographs bearing the legend "Road Construction Ahead," but three of those signs were located 15.6 miles west of the scene of the accident and the other sign was located 9.2

---

8. For cases discussing the duty of a motorist, under certain circumstances, to look to the rear before making a leftward movement or turn, see McDaniels v. Hall, 426 S.W.2d 751 (Mo.App.1968) ; Lands v. Boyster, 417 S.W. 2d 942 (Mo.1967) ; Myers v. Searcy, 356 S.W. 2d 59 (Mo.1962) ; Reed v. Shelly, 378 S.W.2d 291 (Mo.App.1964) ; Moore v. Quality Dairy Company, 425 S.W.2d 261 (Mo.App.1968).

miles west of it, or at least Tri City's evidence so showed.

Tri City's witness, Cecil Harrington, who was the "project manager" for the construction work Tri City was doing, testified that Tri City was not doing any paving of I–44 or surfacing on its shoulder. "We were working on the signs and guardrails and interchange inlets which were in the median between the east and west lanes." Harrington said that Marshall, driver of the Tri City tractor, was going to an area several miles east of the scene for his job assignment that day. Harrington further testified that traffic was flowing on I–44, that it was open for public use, and that motorists were driving up to the speed limit.

There was nothing in the evidence to show Marshall's motive in turning from the shoulder into Lane 1, nor was there any evidence to show that Axline had any reason to anticipate such a movement.

Cases cited by Tri City in support of its first contention are all distinguishable on their facts.

The evidence which has been outlined does not convict Axline of contributory negligence as a matter of law. Reasonable minds could differ as to the quality of his conduct and the issue of his contributory negligence was clearly one for the jury. Ruediger v. American Bus Lines, Inc., supra, 426 S.W.2d at 10[8]; Shannon v. Unsell, 50 S.W.2d 1059, 1061[1] (Mo.App. 1932); Young v. Anthony, 248 S.W.2d 864, 867[2] (Mo.1952); Dawson v. Scherff, 281 S.W.2d 825, 830[2, 4] (Mo.1955); Woods v. Chinn, 224 S.W.2d 583, 586[2] (Mo.App.1949); Kueckelhan v. Denver-Chicago Trucking Co., 237 S.W.2d 926, 928

[2, 3] (Mo.App.1951); Clark v. Howard, 273 S.W.2d 771, 774[1–4] (Mo.App.1954); 2 Blashfield, supra, § 112.7, pp. 625–628, and § 113.14; pp. 719–720.

The second contention of Tri City deals with Lambert's verdict directing instruction, Instruction No. II. Instruction No. II, the complete text of which is set forth below,[9] required the jury to find that Marshall "suddenly turned to the left at a time when such movement could not be made with reasonable safety."

Tri City makes no attack upon the form of Instruction No. II but asserts there was no evidence to support the giving of it. Much of the evidence which has been discussed in connection with Tri City's first contention is material here.

Marshall did turn the Tri City tractor to the left and he did so at a time when the vehicles were separated by less than 1/10 of a mile in distance and by less than 8 seconds in time.

Within the period of time, whatever it was, when Axline was making his glance, Marshall had made a 35 degree turn of the Tri City tractor. During that time he had changed its position from being completely on the shoulder to being mostly in Lane 1. This maneuver required no more time, if as much, as that spent by Axline in making his glance. Tri City's attorneys elicited from Axline the testimony that the glance was performed "just momentarily" and "in the short time."

Since the jury could properly find that the glance was a momentary one, it could also find that a turning movement which did not consume more time than the glance, and may have consumed less, was a sudden one.

9.                Instruction No. II
"Your verdict must be for the plaintiff if you believe:
   "First, William Marshall suddenly turned to the left at a time when such movement could not be made with reasonable safety, and,
   "Second, William Marshall was thereby negligent, and

"Third, as a direct result of such negligence, plaintiff sustained damage, unless you believe that plaintiff is not entitled to recover by reason of Instruction III."
Instruction III, offered by defendant, was a contributory negligence instruction submitting Axline's alleged failure to keep a careful lookout.

In 2 Blashfield, supra, § 113.8, l.c. 695, it is said: "Ordinarily the question whether the driver of a vehicle was negligent . . . in pulling abruptly from a position outside the usual traveled portion of the highway into a lane of traffic, and whether such negligence was the proximate cause of a subsequent accident involving a vehicle approaching from the rear, are questions of fact for the jury."

The evidence was sufficient to support the assignment of negligence contained in Instruction No. II.

There is no claim by Tri City that the jury's verdict of $18,000 was excessive.

The order of October 16, 1972, setting aside the default judgment of October 10, 1972, in the sum of $30,520 is approved and the final judgment of March 16, 1973, in the sum of $18,000 is affirmed.

HOGAN, C. J., and STONE, TITUS and BILLINGS, JJ., concur.